## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

**UNITED STATES OF AMERICA,**
            **Plaintiff,**                                    **CASE NO.: 4:23-CR-3010**

**vs.**

**MICHAEL GLASPIE aka "MIKE G,"**
            **Defendant(s).**
_____/

## DEFENDANT'S SENTENCING MEMORANDUM IN SUPPORT OF MOTION FOR DOWNWARD VARIANCE

**COMES NOW**, the Defendant, MICHAEL GLASPIE aka "MIKE G", by and through undersigned counsel, pursuant to Fed. R. Crim. P. 32 and 18 USC § 3553(a) and respectfully submits the following Sentencing Memorandum to aid the Court at sentencing. The Defendant hereby notifies the Court that he has received and reviewed the Pre-Sentence Report. The Defendant respectfully requests that the Court impose a sentence of home confinement in lieu of incarceration followed by a period of supervised release based upon:

A. His lack of history of violence or any criminal record.

B. Having a stable place to live.

C. His poor and declining health.

D. His ability to adhere to all of the rules of supervised electronic confinement.

1

1. Mr. Glaspie comes before this Court having pled guilty on February 23, 2023, to Count One of the Information charging the Defendant with Wire Fraud, in violation of Title 18, United States Code, Section 1343.

2. As to Count One, the maximum term of imprisonment is twenty years. 18 U.S.C. § 1343.

3. Pursuant to Plea Agreement [D.E. 14] and Federal Rule of Criminal Procedure 11(c)(1)(B), the government has agreed to the following calculation of the offense for sentencing purposes:

    a. Base Offense Level - The parties agree that the defendant's base offense level under U.S.S.G. § 2B1.1(a) is 7.

    b. Specific Offense Characteristics – The parties agree that the defendant, through the wire fraud scheme, caused losses of at least $55,000,000, and thus an increase of 22 levels under U.S.S.G. § 2B1.1(b)(1)(I) applies. The parties also agree that the offense involved 10 or more victims, was committed through mass-marketing, and/or resulted in substantial financial hardship to one or more victims, and thus, an increase of 2 levels under U.S.S.G. § 2B.1.1(b)(2)(A) applies. The parties also agree that the offense involved a violation of a prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines, and thus, an increase of 2 levels under U.S.S.G. § 2B1.1(b)(9)(C) applies.[1]

    c. Acceptance of Responsibility – If the defendant is found to be entitled to an offense level reduction under U.S.S.G. § 3E1.1(a) for acceptance of responsibility, the United States hereby moves that the court reduce the defendant's offense level by one additional level, pursuant to U.S.S.G. § 3E1.1(b), if that paragraph otherwise applies.

---

[1] The Defendant objects to any violation of an administrative order, injunction, or decree.

    d. Downward Departure – The parties agree that a downward departure is warranted because the amount of loss overstates the seriousness of the offense due to the fact that a substantial number of investors invested primarily due to Neil Chandran's false statements rather than the defendant's own false promises and statements. In such circumstances, the gain to the defendant, $2,424,971, is a better measure of the defendant's true culpability, and thus the parties agree that a downward departure of six levels is appropriate.

4. Paragraph C of the Plea Agreement recognized that the Defendant may request or recommend additional downward adjustments and/or departures.

5. Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), Mr. Glaspie respectfully requests this Court to impose a sentence that is "sufficient but not greater than necessary to comply with" the goals of sentencing set forth in 18 U.S.C. § 3553(a). A sentence of home confinement will deprive Mr. Glaspie of his liberty while furthering the Government's interest to protect the public[2] and provide just punishment and afford adequate deterrence.

## Mr. Glaspie's Role in the Charges

Mr. Glaspie spent a substantial portion of his professional career as an internet marketing entrepreneur. On or about May 2018, Mr. Glaspie was approached by Gary Davidson concerning an opportunity to invest. Mr. Davidson explained the principle behind the operation was Neil Chandran,

---

[2] Mr. Glaspie is willing to provide significant cooperation with the Government in current prosecutions arising from this scheme concerning several individuals.

who owned and operated several successful technology companies. Mr. Davidson contacted Mr. Glaspie to solicit his expertise in internet marketing as Mr. Chandran was involved in what was purported to be an exciting investment opportunity. Mr. Glaspie was intrigued by the opportunity and started to conduct his research on Mr. Chandran. Mr. Glaspie's research revealed that Mr. Chandran had strong internet presence with professional marketing videos for his companies such as ViMarket[3] including news reviews from sources such as CTTN, San Francisco[4] and Fintech World.[5] Mr. Chandran was also a keynote speaker at reputable trade shows such as the Crypto Summit[6] promoting virtual reality and crypto tokens. Additional coverage from reputable sources includes the Nasdaq Market Site interviewing an advisor from another of Chandran's companies Freevi.[7] Virse, another Chandran company was also heavily promoted as the future of technology and an extensive video was promoted with Chandran detailing investment levels and opportunities.[8] Another major trade show promoting verse was NFT Los Angeles, Bitcoin 2022 Convention in Miami, Florida

---

[3] https://vimeo.com/142826338
[4] https://vimeo.com/249688916
[5] https://vimeo.com/259011088
[6] https://vimeo.com/260153370
[7] https://vimeo.com/238635559
[8] https://vimeo.com/492267165

labeled as "The Biggest Bitcoin Event in the World.[9],[10]   All of the media coverage, professional marketing campaigns, and keynote speakerships at reputable conventions presented a compelling story of legitimacy and opportunity. A reasonable person would be inclined to believe this was a sound investment opportunity. Convinced of the Mr. Chandran's legitimacy, Mr. Glaspie invested significant sums of his personal money into the scheme. As Mr. Chandran was constantly raising capital, Mr. Davidson recruited Mr. Glaspie to utilize his knowledge of internet marketing to reach potential investors worldwide. Mr. Glaspie developed a "Collateralized Loan Agreement" as he was strictly to be the marketing arm of the investment opportunity. He did not deal directly with Mr. Chandran and all the information, including updates on the investment opportunity, came directly from Gary Davidson. As Mr. Glaspie collected investor's funds, he forwarded the funds directly to Mr. Davidson after taking his small commission for the work he performed. Mr. Glaspie actively promoted the opportunity to invest in the enterprise. As the marketing project became more successful, unbeknownst to Mr. Glaspie, other individuals started to form investor pools to take part in the opportunity and earn commissions. One of these individuals

---

[9] https://vimeo.com/698647638/d5b9567d20?utm_medium=email&_hsmi=209836617&_hsenc=p2ANqtz-_6n1OMxwL6vWQaq58NTuYd10uTpXGfGwUvLQ9CAPVD1cFYSL25GSYWVHlLvOU2o_e-1Mq5KS5SDKFS5ntFtaV_W6a3_Q&utm_content=209836617&utm_source=hs_email%20.
[10] https://b.tc/conference/2022

was Linda Knott, who recruited pools of hundreds of investors to send funds to Mr. Glaspie. These funds were submitted under a single name; however, hundreds of individuals were behind these investments, all without Mr. Glaspie's knowledge.

With regard to the collection of funds, Mr. Glaspie maintained a merchant service account for credit card processing. These transactions were never questioned by the credit card processor. In fact, the credit card processor allowed these transactions to clear despite the multiple flags of possible fraudulent activity. Throughout the time Mr. Glaspie marketed Chandran's investment opportunity, he maintained a webpage providing constant update to investors from the information derived from Gary Davidson. As time passed, deadlines for closing the promised deal were being increasingly delayed, each time with a new "excuse". In 2021, Mr. Glaspie became suspicious and ultimately decided not to collect any more money from investors. He even started approving chargebacks with his credit card processor to make as many investors as possible whole by refunding over $400,000.00.

It should be noted that based on Mr. Glaspie's medical condition, that is more thoroughly detailed below, he was already experiencing the early stages of dementia. While this is not meant to excuse his conduct, it does help explain

how a person in Mr. Glaspie's condition could be more susceptible to believe in such a scheme, and fail to recognize that it was a fraud.  Furthermore, Mr. Glaspie even when confronted with the mounting evidence of Mr. Chandran's fraud, did not want to face the truth that he had been duped into and furthered a scheme that cost people millions of dollars.

It is important to note that the overwhelming majority of the funds that passed through Mr. Glaspie's merchant services account was passed on to Gary Davidson and Mr. Chandran.  Mr. Chandran used Mr. Glaspie to market his scheme and it was Mr. Chandran who pocketed almost the entirety of the proceeds.  While Mr. Glaspie did retain funds received from investors, this amount was very small considering the size of Mr. Chandran's overall scheme.  Approximately two million was retained by Mr. Glaspie.  This entire amount was used to pay expenses, to pay employees and some was used to purchase insurance policies that the U.S. Government seized.  Mr. Chandran pocketed tens of millions of dollars in this scheme that netted well over $150 million.

## LEGAL STANDARD

### I.   STANDARD FOR A VARIANCE FROM THE SENTENCING GUIDELINES

A "variance" outside the guideline range provided for in the Guidelines Manual should occur after consideration of all relevant departure provisions.

*Gall v. United States*, 552 U.S. 38, 48 (2007). In some situations, a prohibited ground for departure may be a valid basis for a variance. *United States v. Chase*, 560 F.3d 828 (8th Cir. 2009) (departure precedents do not bind district courts with respect to variance decisions but may be considered "persuasive authority"). *United States v. Clay*, 579 F.3d 919 (8th Cir. 2009) recognizes that *Gillmore* was partially abrogated by *Gall v. United States*, in that sentencing courts need not justify sentences outside the guideline range through "extraordinary" circumstances: the district court need only "take into account the § 3553(a) factors and recognize that the guidelines are not mandatory."

## II.     FACTORS TO BE CONSIDERED IN 18 U.S.C. § 3553(a)

Post-*Booker*, a sentencing court has "greater latitude" to sentence outside the guideline range, and in "appropriate cases" may conclude that the criminal history category overstates the severity of the defendant's criminal history or that a lower sentence would still comply with and serve the mandates of section 3553(a). *United States v. Collington*, 461 F.3d 805 (6th Cir. 2006); *United States v. McGhee*, 512 F.3d 1050 (8th Cir. 2008) (per curiam).

### 18 U.S.C. § 3553(a)(1): The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Mr. Glaspie has taken full responsibility for his role in the scheme; however, he was acting at the direction of Neil Chandran through Gary

Davidson. While the evidence provided demonstrate Mr. Glaspie's zealous persuasion of investors, the vast majority of the funds, which were over 95% of the monies collected were forwarded to Mr. Chandran through Mr. Davidson, demonstrating that Mr. Glaspie's motivation was not for his own enrichment.

### i.    History of the Defendant

As identified in the PSR, the Mr. Glaspie has zero criminal history points. The only infraction on his record is an arrest in 2021 for driving with a license suspended, which adjudication was withheld.

### ii.    Characteristics of the Defendant[11]

Mr. Glaspie is a 72-year-old male suffering from multiple medical conditions. to include, early onset dementia, spinal stenosis, osteoarthrosis, eight major surgeries, heart problems, and a previous tumor on his kidney.

Recently, Mr. Glaspie presented to Dr. Fix, DO with memory loss that had been progressively worsening gradually over several years. Mr. Glaspie's psychiatrist recently prescribed Mirtazapine for insomnia and Sertraline and Escitalopram for depression and anxiety. Dr. Fix reviewed the results of a

---

[11] *United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) (affirming downward variance from a guideline range of 41-51 months to five years probation in possession of child pornography case based in part on finding that the defendant did not fit the profile of a pedophile, had no history of substance abuse, no interpersonal instability, was motivated and intelligent, and had the continuing support of his family).

recent EEG [3/28/2023] and found it abnormal due to "mild diffuse theta slowing c/w global cerebral dysfunction." A second test was ordered. Mr. Glaspie returned to Dr. Fix to discuss results of the FDG PET CT Brain [05/16/2023] "which demonstrates mild hypoperfusion of the temporal lobes which may indicate early Alzheimer's disease." Dr. Charles Howard, MD, MMM, a retired Medical Officer with the Federal Bureau of Prisons was consulted regarding the effect of incarceration for Alzheimer's patients and has prepared a report outlining the challenges. The following are a few excerpts[12]:

> His health issues started to affect him in 2000 when he underwent his first of many neck surgeries. He has since had at least six Cervical and Lumbar Spine surgeries for herniated discs, and radiculopathy (pain going down an arm or leg). He also had a Rotator Cuff repair in 2009.  In 2015 he had an Oncocytoma (tumor) removed along with a portion of his Left Kidney and Adrenal Gland.   Due to these moderately severely painful conditions, he became a constant user of Codeine pain medication to help control his pain.  He also became very depressed and anxious.  In addition, he was noted to have all the symptoms of secondary Hypogonadism, anxiety, impulsivity, irritability, loss of interest, racing thoughts, and sleep changes. His Endocrinologist place him on Testosterone, which resolved most of these symptoms, as long as he continued every two weeks injections.

> About ten years ago (10) he began having balance issues and started using a cane to help support him while walking.  He later became more and more confused, anxious, and became more and more cognitively confused.  He was seen by a Neurologist who

---

[12] The Full Report is attached to this Memorandum and identified as Exhibit "A".

diagnosed him with Early onset Alzheimer's Disease.   Mr. Glaspie reported that he first noticed difficulty with cognition in 2018, when he stated to his Neurologist that he could not remember how to turn on windshield wipers in his car and was getting lost while driving in formerly familiar areas.

His ambulation and balance issue has become so severe that he no longer can rely on a cane for walking further distances and must use a wheelchair.  Over the last several years his cognitive abilities have decreased further, asking the same question repeatedly, not remembering 5 objects mentioned to him at a medical exam, just minutes earlier. He is noted by his wife to not remember where he put things, or stores things.

Mr. Glaspie has also been followed for Major Depression, and Anxiety in the Riverview Community Mental Health Center. Those notes clearly state that he suffered severe Major Depression, was in Alcohol abuse remission long term (He reports his last alcoholic drink in 1979).  Mr. Glaspie was Baker Acted once for suicidal ideation and released.  He has a history of confusion for over two (2) years, anxiety, depression, poor appetite, avoidance, crying spells, guilt impulsivity, irritability, loss of interest, panic attacks, racing thoughts.

Mr. Glaspie also underwent Nerve Conduction studies and an Electromyogram due to documented decreased sensitivity in both upper extremities.  These were consistent with carpal tunnel syndrome likely resulting from bilateral C5-6, and right C6-7-T-1 radiculopathy. (Cervical spine abnormalities).

Mr. Glaspie's medication list includes:
    For Anxiety: Clonazepam (started in 2017), Zoloft
    For Depression: Mirtazapine, Zoloft, Sertraline
    For Dementia: Donepezil
    For Muscle Spasm: Tizanidine
    For Nerve Pain: Gabapentin
    For Osteoarthritis (mostly Cervical and lumbar spine): Meloxicam
    For Pain: Tylenol with Codeine (since 2006, about 17 years)

For Hypogonadism: (Not muscle building): Testosterone

In my Professional opinion, after a comprehensive exhaustive review of all Medical records available, Mr. Glaspie's Medical condition has significantly deteriorated over the past few years. Mr. Glaspie now requires 24 hour/day, 7 day/week assistance with Activities of Daily Living. It is my understanding that currently, his wife of many years provides him that care.   He is likely to deteriorate to the point of completely bed ridden within the next 5 years.

Mr. Glaspie is currently awaiting a date for another Neck surgery that hopefully, will help decrease his pain level.  If he were to be incarcerated, this would not be accomplished, and he would continue in severe pain, resulting in further incapacitation as his spinal osteoarthritis worsens.  If this surgery and post operative rehabilitation, (Physical Therapy) is not performed prior to incarceration, it would likely be over a year or two pending his re-evaluation after incarceration.   The entire evaluation and conservative care routine would have to be repeated.  This would constitute a Delay in Care, be very costly, and risk his already limited mobility to become so much worse that he is 100% bedridden.

Report of Dr. Howard attached hereto as Exhibit "B".

Dr Howard stated the typical life expectancy of an Alzheimer's patient is 4-8 years with a 60-70% FUNCTIONAL life expectancy. Mr. Glaspie is already at least in his third to fifth year of symptoms. Additional studies confirm this assessment with one study finding life expectancies ranging from 3-10 years.[13] A second study outlined the progression of the disease in persons

---

[13] O. Zanetti, S.B. Solerte, F. Cantoni, LIFE EXPECTANCY IN ALZHEIMER'S DISEASE (AD), Archives of Gerontology and Geriatrics, Volume 49, Supplement, 2009, Pages 237-243, ISSN 0167-4943, https://doi.org/10.1016/j.archger.2009.09.035.

aged 70-80 years. "From the age of 70 to 80 years, a typical AD patient spends 4 years at Clinical Dementia Rating stage 3 (severe)[14], 3 years at stage 2 (moderate)[15], and 3 years at stage 1 (mild).[16][17] It is highly probably that Mr. Glaspie has been experiencing stage 1 symptoms for several years and has reported to various physicians the symptoms are worsening. Based on the current symptoms, it is likely Mr. Glaspie has entered stage 2 of the disease. A period of incarceration will see Mr. Glaspie enter the correctional facility aware of his family and surroundings and upon release will be unable to recognize any of his loved ones and be unable to care for himself.

The Sentencing Guidelines provide that advanced age and poor health may merit a downward departure or home confinement in lieu of incarceration. See U.S.S.G. §5H1.1 ("Age may be a reason to depart downward in a case in

---

[14] **Severe**:
Cannot communicate, depend on others for care. In bed most of time. Can't communicate, no awareness of recent experience or surroundings, weight loss, no interest in eating, seizures, physical decline, dental, skin, foot, difficulty swallowing, groan, moan, grunt, increased sleep, total loss of bowel and bladder control. Death commonly due to aspiration pneumonia.

[15] **Moderate:**
Increased confusion, memory loss, of events, personal history, withdraw from social activity, inability to learn new things, difficulty with language, reading, writing, working with numbers, organizing thoughts, thinking logically, short attention span, comping in new situations. Sleep pattern change. Difficulty with Acitivites of Daily Living like dressing. Hallucinations, delusions, paranoia, impulsive, undressing inappropriately, vulgarities, inappropriate emotional outbursts, restless, agitation, anxiety, tearful, wander especially late PM, repetitive statements/movements, muscle twitches.

[16] **Mild:**
Memory loss, poor judgement, loss of spontaneity/sense of initiative, losing track of dates or location. Longer to complete normal Activities of Daily Living, Repeating questions, forgetting recent learning. Trouble handling money or bills, Challenges planning or solving problems, wandering, getting lost, misplacing things, Difficulty completing tasks like bathing, mood/personality change, increased anxiety/aggression..

[17] Arrighi, Henry Michael PhD, MSPH*; Neumann, Peter J. ScD†; Lieberburg, Ivan M. MD, PhD; Townsend, Raymond J. PharmD. Lethality of Alzheimer Disease and Its Impact on Nursing Home Placement. Alzheimer Disease & Associated Disorders 24(1): p 90-95, January 2010. | DOI: 10.1097/WAD.0b013e31819fe7d1

which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration."); U.S.S.G. §5H1.4 ("Physical condition . . . may be relevant in determining whether a departure is warranted, if the condition . . ., individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinarily physical impairment may be a reason to depart downward, e.g. in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.") Although age and physical condition are "not ordinarily relevant to determining whether the defendant should receive a departure from the applicable guideline range . . . an 'extraordinary physical impairment' may be reason enough to impose a sentence below the guideline range. Such conditions are ones that render the defendant 'seriously infirm'" (United *States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (citation and internal quotation marks omitted). Courts have found advanced age and infirmity to be "significant" and have often departed drastically from the guidelines in such circumstances and imposed noncustodial sentences. See, e.g., United *States v. Baron*, 914 F. Supp. 660, 662 (D. Mass. 1995) (departing from a 27 - 33-month guideline range to impose a noncustodial sentence – one year of

probation including 6 months of home confinement – for defendant with pituitary disease, a coronary artery disease, hypertension, and suspected prostate cancer, reasoning, "The defendant is 76 – years old. His life expectancy is 7.39 years. Few cases involve defendants in this age range, and those that do have found it significant."); *Rioux*, 97 F.3d at 663 (Court affirmed a noncustodial sentence – 3 years' probation, including 6 months of home confinement – for a 61-year-old "seriously infirm" defendant with a 33 – 41-month guidelines range. The defendant had a diseased but stable kidney for which he required regular blood tests and prescription medicines, and a double hip replacement that required monitoring; the Court also noted his charitable acts, especially his raising of money for the Kidney Foundation); *United States v. Barbato*, 2002 U.S. Dist. LEXIS 22203, at *14 (S.D.N.Y. Nov. 13, 2002) (Court "[found] that the Page 13 of 2914  combination of [defendant's] medical condition and his advanced age [were] such that a downward departure would be appropriate," imposing a noncustodial sentence (12 months of home confinement) for an 81-year-old defendant suffering from hypertension, carotid artery disease, and coronary artery disease, who had a 24 – 30 month guideline range, despite the government's contention that the defendant's ailments could be "adequately addressed" by the Bureau of Prisons).

Mr. Glaspie's situation as a seriously ill, elderly man affords him chance for consideration for a similar downward departure. Mr. Glaspie suffers from a spinal tumor (five spinal surgeries-1pending), no testosterone (requires bi-monthly shots), dementia Moderate to advanced stage), prescribed oxycodone addiction, severe depression and mental illness, PTSD from severe childhood physical and emotional abuse, he requires extensive dental work for implants that is not provided in prison, osteo arthritis, carpal tunnel syndrome (right hand is permanently numb due to nerve damage as is his left thigh), nightmares and has fallen out of bed four times recently, Covid-19 three times, cannot hold bladder longer than 90 minutes, cannot sit more than 45 minutes, uncontrollable sobbing, and OCD (obsessive compulsive disorder with many repetitive ideation that will likely make him a target in prison), extreme fatigue, constant gastrointestinal problems, and complications from his various hospitalizations.

According to Dr. Howard, incontinence and problems of cleanup after daily bowel accidents must be emphasized here. The prison may provide someone to help with wheelchair mobility but certainly will not help with the cleanup of feces. This is a task that Mr. Glaspie cannot do without help. Prisoners do not want to share a room – often three men to a room with an

incontinent roommate. They will resent the stench and will not help him. His safety may be at risk under these circumstances.

Alzheimer's affects judgment and ability to "know or not know" if he was being drawn into a crime. His life prior to his contact with Mr. Chandran was crime free and this criminal conspiracy was abnormal behavior for Mr. Glaspie. His impaired judgment was a mitigating factor. Dr. Fix places his onset at about ten years ago.

He will most likely require a wheelchair in prison and someone to help him with bodily function "accidents" (he has these daily and will require assistance in clean-up- these services are not provided in prison, and he fears retaliation from roommates or guards). There is almost no mental health treatment in prison, and Mr. Glaspie will need consistent and recurrent therapy to cope with his incarceration and Alzheimer's. He will also require a bed with bars to keep him from falling out of bed. For the past four weeks, Mr. Glaspie has been experiencing dizziness. This is a constant sense of imbalance, and he clings to chairs and walls. He is unable to go even a short distance without his cane.

He has had to give up driving because his reaction time is too slow. Last time he drove, the car in front of him stopped short and he had a "near miss." This loss of independence was very stressful for him. His advancing

Alzheimer's disease has him becoming more and more manic and in mental distress.

Limited institution staff according to Dr. Howard, and inadequate staff training affect the BOP's ability to address the needs of aging inmates. The physical infrastructure of BOP institutions also limits the availability of appropriate housing for aging inmates. Further, the BOP does not provide programming opportunities designed specifically to meet the needs of aging inmates. Aging inmates engage in fewer misconduct incidents while incarcerated and have a lower rate of re-arrest once released; however, BOP policies limit the number of aging inmates who can be considered for early release and, as a result, few are actually released early.[18]   Numerous studies done in recent years detail the difficulties even healthy elderly inmates face. "Older prisoners, even if they are not suffering illness, can find the ordinary rigors of prison particularly difficult because of a general decline in physical and often mental functioning which affects how they live in their environments and what they need to be healthy, safe, and have a sense of well-being."[19]   When an inmate suffers from cancer or other chronic health issues, their situation deteriorates further. Not only does the average inmate have to

---

[18] See Office of the Inspector General, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons, (2015. Rev Oct. 2018) at i, available at https://oig.justice.gov/reports/2015/e1505.pdf.

[19] Human Rights Watch, Old Behind Bars – the Aging Prison Population in the United States, at 7 (Jan. 2012).

"pay for each visit to a health care provider," but "most inmates are not allowed to keep medications in their cells if they are too sick to stand in the pill line, they miss their chance to obtain relief." [20]

There is no guarantee on the scheduled regularity of such treatment in prison, no matter how necessary they are. In contrast, Dr. Fix' most recent letter stated Mr. Glaspie's "incurable" condition "requires constant monitoring . . . at least monthly and, at times, weekly" to prevent his chronic issues becoming fatal." Allowing Mr. Glaspie's health to be dependent on check-ups that may be infrequent at best is unconscionable given the severity of his illness, since "continued medical care [is] critical for his survival." *Id*. Undersigned counsel believes that Mr. Glaspie's case is similar to United States v. Edwards, in which the appellate court found "the Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." (555 U.S.  350, 352, 129 S. Ct. 890, 892 (2009)) For these reasons, a non-custodial sentence is appropriate.

## 18 U.S.C. 3553(a)(2): The Need for the Sentence Imposed

A sentencing "court  shall impose a sentence sufficient,  but  not  greater than  necessary,  to  comply  with  the  purposes  set  forth  in  paragraph  (2)  18

---

[20] In addition to problems with pain management and side effects within the walls of the prison, inmates have chosen to forego needed outpatient visits because of excessive discomfort, foregoing of morning medications, and the embarrassment of shackled transport around the hospital or clinic. Id

U.S.C. § 3553. *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008). "These purposes include, *inter alia,* promoting respect for the law, deterring criminal conduct, and protecting the public from further crimes of the defendant." *Id. See* 18 U.S.C. § 3553(a)(2). The sentencing court must also consider the following factors in determining a particular sentence: the nature and circumstances of the offense and the history and characteristics of the defendant, the kinds of sentences available, the Guidelines range, the pertinent policy statements of the Sentencing Commission, the need to avoid unwarranted sentence disparities, and the need to provide restitution to victims.

### A. To Reflect The Seriousness of The Offense, To Promote Respect for The Law, and to Provide Just Punishment for the Offense

Mr. Glaspie promptly admitted responsibility for his part in the scheme and appreciates the seriousness of the offense. However, this case presents a unique set of circumstances for the Court to consider. With incarceration, the punishment is loss of freedom. In Mr. Glaspie's case, a sentence of home confinement will serve the same purpose while relieving the government from the enormous expense of caring for his many medical needs. Based on the state of his disease, it is likely that Mr. Glaspie will not only be a prisoner inside the walls of his home, but further become a prisoner in his own mind.

### B. To Afford Adequate Deterrence to Criminal Conduct

The loss of freedom serves as an adequate deterrent to criminal conduct. General deterrence—along with retribution, rehabilitation, and incapacitation—expressly makes up one of the four purposes of sentencing identified by Congress in Section 3553(a). *United States v. Pugh*, 515 F.3d 1179, 1194 (11th Cir. 2008). *See also* S.Rep. No. 98–225, at 75–76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("to deter others from committing the offense" is one of the four purposes of sentencing). Congress intended that courts consider each of these four stated factors "in imposing sentence in a particular case." *Id*. at 68, 75, 1984 U.S.C.C.A.N. at 3251, 3258; *Id*. at 77, 1984 U.S.C.C.A.N. at 3260 ("The intent of subsection (a)(2) is ... to require that the judge consider what impact, if any, each particular purpose should have on the sentence in each case."). As the Eighth Circuit has observed, "general deterrence ... is one of the key purposes of sentencing ...." *United States v. Medearis*, 451 F.3d 918, 920–21 (8th Cir.2006) (quotations omitted). In the case at bar, the Defendant will suffer a loss of liberty while at the same time experiencing the effects of a progressive disease that requires round-the-clock care.

C.  To Protect The Public From Further Crimes Of The Defendant

Due to the Defendants' rapidly declining cognitive ability, there is a very low risk of recidivism. The scheme involved in the case at bar required a form

of sophistication, which the Defendant does not possess. The prognosis from medical professionals is that Mr. Glaspie's condition will only worsen resulting in a complete loss of any forethought required to perpetrate the scheme at issue.

### D. To Provide The Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

"Section 3582(a) states in relevant part that "imprisonment is not an appropriate means of promoting correction and rehabilitation." *United States v. Ferguson*, 317 Fed. Appx. 867, 868 (11th Cir. 2008). In *United States v. Brown*, 224 F. 3d 1237, 1240 (11th Cir. 2000), the Court stated, "a court cannot impose an initial incarcerate sentence for the purpose of providing a defendant with rehabilitative treatment." Given the facts of this case, Mr. Glaspie's medical condition and need for specialized rehabilitation is persuasive. Mr. Glaspie has been selected for a drug trial to determine the effects of REMTERNETUG[21] developed by Eli Lily. This 79-week program is not available to anyone other than program recipients. The medication is designed to arrest the long-term degenerative effects of Alzheimer's disease. During the course of the trial, there are frequent additional MRI and PET scan

---

[21] https://www.alzheimers.org.uk/blog/three-promising-drugs-for-treating-alzheimers-disease-bring-fresh-hope

examinations, which are highly controlled to determine the effects of the medication. It is not yet known if the drug is a permanent abatement of the disease or if it will be required as a lifelong treatment. Dr.  Greene, who is conducting the trial states that Mr. Glaspie would continue to receive the drug after the formal study if it was determined to be a lifelong regime until it was available commercially. If Mr. Glaspie is incarcerated, he will not have access to this medication and follow up studies to determine the effects of the medication. Any period of incarceration will permit the disease to continue to progress and disqualify Mr. Glaspie from participating in this promising study that may benefit millions of Alzheimer's patients. Moreover, Mr. Glaspie's current condition is such that he lacks the ability for self-care. His Wife has become his fulltime caretaker i.e., washing, dressing, etc. This assistance will not be available in a detention facility. Due to his age and many medical maladies, Mr. Glaspie is prone to infection and/or more serious illness. Any inability to maintain appropriate hygiene would almost lead to certain death.

## Variances vs. Departure from Guidelines

Courts have held that variances are not subject to the guideline analysis for departures. *See e.g. United States v. Fumo*, 655 F.3d 288, 317 (3d Cir. 2011), as amended (Sept. 15, 2011). "[A]lthough departures under §5K1.1 require a motion from the government, variances do not." *United States v. Massey*, 663

F.3d 852 (6th Cir. 2011). "[A] sentencing judge has the discretion to consider a variance under the totality of the § 3553(a) factors (rather than one factor in isolation) on the basis of a defendant's fast-track argument," and "such a variance would be reasonable in an appropriate case." *United States v. Arrelucea-Zamudio*, 581 F.3d 142 (3d Cir. 2009). As the United States Supreme Court has held in *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586 (2007), sentencing courts need not justify sentences outside the guideline range through "extraordinary" circumstances: the district court need only "take into account the § 3553(a) factors and recognize that the guidelines are not mandatory."

## CONCLUSION

Based on the totality of the factors in Section 3553(a) cited above, Mr. Glaspie's unique situation should persuade this Honorable Court that the imposition of a period of substantial incarceration would depart from the intended purpose of the statute.  Due to the severity of Mr. Glaspie's medical condition, and the likelihood that he will become fully nonfunctional in the next 2-4 years, the Court should consider the compelling and extraordinary medical reasons home confinement in lieu of incarceration so he may receive the benefit of a potential lifesaving therapy.

Respectfully submitted,

JEFF T. GORMAN LAW OFFICES

By: /s/ Jeff T. Gorman
        Jeff T. Gorman
        Florida Bar No.: 538183
        47 SE Ocean Boulevard
        Stuart, Florida  34994
        Phone: 772.220.4000
        Facsimile: 772.220.4114

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 25th day of August, 2023 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/ Jeff T. Gorman
        Jeff T. Gorman, Esq.
        Florida Bar No.: 538183

## SERVICE LIST

**UNITED STATES vs. MICHAEL GLASPIE aka "MIKE G"**
**CASE NO.: 4:23-CR-3010**
**United States District Court For the District of Nebraska**

Jeff T. Gorman, Esq.
*Counsel for the Defendant*
Florida Bar No.: 359970
E-Mail: jgorman@jgormanlaw.com
Notices of Electronic Filing

Assistant U.S. Attorney
Tian Huang, Esq. (CRM)
E-Mail: tian.huang@usdoj.gov

Assistant U.S. Attorney
Donald Klein, Esq. (USANE)
E-Mail: dkleine@usdoj.gov
Notices of Electronic Filing

Assistant U.S. Attorney
William Johnston, Esq. (CRM)
E-Mail: william.johnston4@usdoj.gov
Notices of Electronic Filing

Assistant U.S. Attorney
Amy Donato, Esq. (USANE)
E-Mail: adonato@usdooj.gov
Notices of Electronic Filing

Section 1 of 5

## CPL Agreement (Collateralized Personal Loan)

Please complete this form to enter your pledge

Email *

Valid email

This form is collecting emails.  Change settings

After section 1    Continue to next section

---

Section 2 of 5

CPL Agreement (Collateralized Personal Loan)

IF YOU HAVE MADE A PLEDGE, AND NOT RECEIVED YOUR INVOICE YET, IT WILL BE SENT WITHIN THE NEXT COUPLE OF DAYS.

PLEASE REFRAIN FROM EMAILING AMY ABOUT IT UNTIL AT LEAST 48 HOURS AFTER IT WAS PLACED

=================================================

PLEASE READ THROUGH CAREFULLY

TERMS:
With any invoice I pay I acknowledge and agree:

1>  The invoice sent to me will come from BannerCo-op/ BannersGo LLC, and the charge on my statement will appear as ICAN Connect Us.

2>  Any costs and fees associated with any chargeback will be taken out of my initial purchase resulting in a lower payback.

3>  All Updates are posted at www.MikeGDeal.com and even if I am not seeing Updates in my email inbox I can check this link at any time for the newest information.

4>  There is no hard fast deadline, no guarantee of closing and receiving the payback return, and I realize things take time and I have the patience to see this to completion.

5>  There are no refunds or credits for any transaction, and I understand the guarantee* offered.

6>  Anyone you refer in the past, now, or in the future, is under these same terms and if a referral initiates a chargeback you will be held responsible for any costs and fees.

7>  This understanding covers any transactions current, previous, and future, for this same offer.

8>  Your participation will not be accepted without receipt of this agreement.

On a personal note, when your credit card is processed Mike G uses your money for this deal and expenses of managing it, and if you cancel or do a chargeback it comes directly out of his pocket. Please don't do that to him.

* Guarantee:
All loans are collateralized two ways:
1) By the seller with an equal value of crypto currencies to cover every dime loaned.
2) Mike G's personal pledge to (in the absolute worst case scenario) pay everyone back their loan amounts out of his other corporate earnings, at 7% annual interest, fully due and payable within three years from any date that we declare our deal as dead as a doorknob.

After section 2    Continue to next section

**Exhibit A**

---

Section 3 of 5

Complete this section

Did you CAREFULLY and COMPLETELY read the terms above? Do you know there are almost daily updates written and sent by Mike G so you can keep abreast of the process? Do you know the deadline for participation? If not, please read through the terms again before answering these questions below.

Are there any refunds? *

○ Yes

○ No

Who will the order form come from? *

○ BannerCo-op / BannersGo LLC

○ ICAN Connect Us

How will this charge appear on your billing statement? *

○ BannerCo-op / BannersGo LLC

○ ICAN Connect Us

Do you agree to these terms above? *

○ Yes

○ No

Please type your name below in agreement with this form *

Short answer text

Amount of pledge ($500 minimum & $500 increments) *

Short answer text

Method of payment *

○ credit card

○ debit card

○ wire transfer

○ bitcoin or ethereum

Your Sponsor / Who referred you (Full name & Email) *

Short answer text

Is this for yourself or are you referring someone? *

○ Yourself

○ Other_

Is this your first time making a Collateralized Personal Loan or are you making an additional pledge?

○ 1st time participation

○ Additional pledge

All questions above must be answered to receive an invoice.

Description (optional)

After section 3    Continue to next section

---

**Section 4 of 5**

Country

We have added this question which will help after the deal closes and we arrange payback

What country are you in? *

Short answer text

After section 4    Continue to next section

---

**Section 5 of 5**

Receiving your invoice (be sure to click the 'submit' button below)

IF YOU HAVE MADE A PLEDGE, AND NOT RECEIVED YOUR INVOICE YET, IT WILL BE SENT WITHIN THE NEXT COUPLE OF DAYS.  PLEASE REFRAIN FROM EMAILING AMY ABOUT IT UNTIL AT LEAST 48 HOURS AFTER IT WAS PLACED.

After making your pledge for a collateralized personal loan:

Again, the invoice sent will come from "BANNERCO-OP / BannersGo LLC",
and the charge on billing statement will appear as "ICAN CONNECT US"

NOTE:  All invoices, after reviewing submitted information, are manually sent - which means me, a real live person that doesn't work 24/7. Please be patient and only email if you have not seen your invoice after 2-3 business days.

If you choose the option of sending by wire transfer you will be emailed banking information.

If your pledge was for collateralized personal loan payment by credit/debit card, you will be sent an invoice via email.  Once you receive this you can click on the link to the secure online form, and there will be a line to insert your cc# / expiration date / 3-digit # and click "Pay Invoice". After you have done so you will see a receipt you can print out or download - You will not be sent a separate receipt.

For answers to Frequently Asked Questions, read through these BEFORE sending an email.
http://icdmail.com/cdupdates/cpl-faq.html

Be sure to follow all of Mike G's updates at http://MikeGDeal.com

If you have any questions not answered in the FAQ's, please let me know.
Sincerely,
Amy Mossel
Assistant to Mike G.
amysue.ican@gmail.com

 Gmail

**Amy Mossel <assistanttomikeg@gmail.com>**

## CPL Agreement (Collateralized Personal Loan)
1 message

**Pablo Garcia** <pabloagarcia925@gmail.com>                    Tue, Sep 21, 2021 at 10:38 PM
To: ican.noura@gmail.com, assistanttomikeg@gmail.com

Ok thanks , however I did place one $1,000 pledge for myself is the invoice coming? It is taking a bit longer than usual.

Thanks

Pablo A. Garcia
(813) 260-0724

On Sep 21, 2021, at 14:31, ican.noura@gmail.com wrote:

Hello Pablo,

I have fixed your invoice requests. All invoices will be sent in the order they are received. Because it is a Crypto Currency Exchange, these may take longer to send especially with Amy out of town this week. For this week's pledges only- have your referral look for an email from AssistantToMikeG@gmail.com regarding this request within the next 48 hrs.

Thank you,

Noura

**From:** Mike G <michael.glaspie@gmail.com>
**Sent:** Tuesday, September 21, 2021 1:07 PM
**To:** Noura Abbas <ican.noura@gmail.com>
**Subject:** Fwd: Fwd: CPL Agreement (Collateralized Personal Loan)

Noura
see below for fix and new invoice

Mike G.
CEO
www.SeeWhatOthersAreSaying.com
www.MikeGVideos.com

-------- Forwarded Message --------

**Subject:** Fwd: CPL Agreement (Collateralized Personal Loan)

**Date:** Tue, 21 Sep 2021 12:29:10 -0400

**From:**Pablo Garcia <pabloagarcia925@gmail.com>

   **To:**Mike G <michael.glaspie@gmail.com>

Hello Mike, this pledge form contains the wrong email for the partner can you please have the office fix it to ocholi3@outlook.com

Sorry was helping the partner and my PC auto-populated my email address, please have the invoice sent to ocholi3@outlook.com

Thanks!

Pablo

---------- Forwarded message ---------
From: **Google Forms** <forms-receipts-noreply@google.com>
Date: Tue, Sep 21, 2021 at 12:07 PM
Subject: CPL Agreement (Collateralized Personal Loan)
To: <PABLOAGARCIA925@gmail.com>

## Thanks for filling out CPL Agreement (Collateralized Personal Loan)

Here's what was received.

# CPL Agreement (Collateralized Personal Loan)

IF YOU HAVE MADE A PLEDGE, AND NOT RECEIVED YOUR INVOICE YET, IT WILL BE SENT WITHIN THE NEXT COUPLE OF DAYS. PLEASE REFRAIN FROM EMAILING AMY ABOUT IT UNTIL AT LEAST 48 HOURS AFTER IT WAS PLACED

 Gmail

**Amy Mossel <assistanttomikeg@gmail.com>**

---

## Re: Fwd: CPL Agreement (Collateralized Personal Loan)
1 message

---

**Nelson Pena <gmehn13@yahoo.com>**                    Fri, Oct 1, 2021 at 5:18 PM
To: alex tavarez <alexnyc19@gmail.com>, Amy Mossel <assistanttomikeg@gmail.com>

Good afternoon Amy:

Since today is the last Pledge day, will the invoice be sent today? Please advise thank you

My pledge is Alex Tavarez, thanks again

Regards,
Nelson Peña
732-925-1991


Sent from Yahoo Mail for iPhone


On Friday, October 1, 2021, 5:08 PM, alex tavarez <alexnyc19@gmail.com> wrote:

> ---------- Forwarded message ---------
> From: **Google Forms** <forms-receipts-noreply@google.com>
> Date: Fri, Oct 1, 2021, 3:00 PM
> Subject: CPL Agreement (Collateralized Personal Loan)
> To: <alexnyc19@gmail.com>

Thanks for filling out CPL Agreement (Collateralized Personal Loan)

Here's what was received.

# CPL Agreement (Collateralized Personal Loan)

IF YOU HAVE MADE A PLEDGE, AND NOT RECEIVED YOUR INVOICE YET, IT WILL BE SENT WITHIN THE NEXT COUPLE OF DAYS.
PLEASE REFRAIN FROM EMAILING AMY ABOUT IT UNTIL AT LEAST 48 HOURS

 Gmail

**Amy Mossel <assistanttomikeg@gmail.com>**

## Pledge
2 messages

---

**Melvin Hughey** <melhughey1@gmail.com>                    Thu, Oct 21, 2021 at 9:51 AM
To: assistanttomikeg@gmail.com

Morning Amy, are pledge still open. If so, can form be sent to
Trinalgm84@gmail.com
Hope you're doing well and feeling better.

Thank you
Mel

---

**assistanttomikeg@gmail.com** <assistanttomikeg@gmail.com>          Thu, Oct 21, 2021 at 10:24 AM
To: Melvin Hughey <melhughey1@gmail.com>

CPL Agreement (Collateralized Personal Loan) Not open to residents of the State of Michigan (google.com)

**From:** Melvin Hughey <melhughey1@gmail.com>
**Sent:** Thursday, October 21, 2021 9:52 AM
**To:** assistanttomikeg@gmail.com
**Subject:** Pledge

Morning Amy, are pledge still open. If so, can form be sent to

Trinalgm84@gmail.com

Hope you're doing well and feeling better.

Thank you

Mel

 Gmail

**Amy Mossel <assistanttomikeg@gmail.com>**

## Fw: CPL Agreement (Collateralized Personal Loan) Not open to residents of the State of Michigan

1 message

**Patrick M Blackman** <silverstreak1970@hotmail.com>                    Fri, Oct 22, 2021 at 5:22 PM
To: "assistanttomikeg@gmail.com" <assistanttomikeg@gmail.com>

To whom it may concern. Hi. I'm Patrick M Blackman. I made a pledge of $500. Unfortunately. I have my sponsor email address incorrect. My sponsor correct email address is: theresa.mccollum12@gmail.com. Thank you.

**From:** Google Forms <forms-receipts-noreply@google.com>
**Sent:** Friday, October 22, 2021 1:59 PM
**To:** silverstreak1970@hotmail.com <silverstreak1970@hotmail.com>
**Subject:** CPL Agreement (Collateralized Personal Loan) Not open to residents of the State of Michigan

Thanks for filling out CPL Agreement (Collateralized Personal Loan) Not open to residents of the State of Michigan

Here's what was received.

# CPL Agreement (Collateralized Personal Loan) Not open to residents of the State of Michigan

Please complete this form to enter your pledge

Email *

silverstreak1970@hotmail.com

 Gmail

**Amy Mossel <assistanttomikeg@gmail.com>**

## RE: MISSING INVOICE
5 messages

**assistanttomikeg@gmail.com** <assistanttomikeg@gmail.com>       Wed, Oct 27, 2021 at 10:57 AM
To: royalthreeandme@gmail.com

The only invoice I am showing open is the following for $500:

https://invoice.stripe.com/i/acct_1EozFNDwOeuWnGQH/live_YWNjdF8xRW96Rk5Ed09IdVduR1FILF
9LVHd5bFJQYzNBUnc1MmppMHdObURidHZkQzRWazk30100IhHCkXxV

Thank you,

Noura

**From:** Mike G
**Sent:** Wednesday, October 27, 2021 10:48 AM
**To:** Noura Abbas
**Subject:** Fwd: MISSING INVOICE

Noura, please see below.

Mike G.
CEO
www.SeeWhatOthersAreSaying.com
www.MikeGVideos.com

-------- Forwarded Message --------

**Subject:** MISSING INVOICE

   **Date:** Tue, 26 Oct 2021 23:44:56 -0600

   **From:** Jennie Contreras <royalthreeandme@gmail.com>

      **To:** mtg@mysiteinc.com

Hi! It looks like I have one missing invoice.if it isn't this one, then it's another one for $1000 that I requested around

9:00pm EST on 10/25, but I'm pretty sure that one came in this evening and I paid for it. This one, which was requested on Saturday 10/23 is the one that I have not received an invoice for and will bring my total to $76k.

Thank you so much!

Jennie Contreras

970.618.6397

Begin forwarded message:

> **From:** Google Forms <forms-receipts-noreply@google.com>
> **Date:** October 23, 2021 at 12:42:40 PM MDT
> **To:** royalthreeandme@gmail.com
> **Subject: CPL Agreement (Collateralized Personal Loan) Not open to residents of the State of Michigan**

Thanks for filling out CPL Agreement (Collateralized Personal Loan) Not open to residents of the State of Michigan

Here's what was received.

# CPL Agreement (Collateralized Personal Loan) Not open to residents of the State of Michigan

Please complete this form to enter your pledge

Email *

royalthreeandme@gmail.com

 **Gmail**

**Amy Mossel <assistanttomikeg@gmail.com>**

---

### Fwd: CPL Agreement (Collateralized Personal Loan) Not open to residents of the State of Michigan

2 messages

---

**Kellsa Tayler** <kellsa.tayler@gmail.com>                                    Thu, Oct 28, 2021 at 1:09 AM
To: Amy Mossel <assistanttomikeg@gmail.com>, Mike G <michael.glaspie@gmail.com>

I just noticed I still need to send this. I can't seem to find the invoice.

Tamara Taylor creator of
The Affluent Millionaires Club

---------- Forwarded message ---------
From: **Google Forms** <forms-receipts-noreply@google.com>
Date: Mon, Oct 25, 2021 at 10:02 PM
Subject: CPL Agreement (Collateralized Personal Loan) Not open to residents of the State of Michigan
To: <kellsa.tayler@gmail.com>

Thanks for filling out CPL Agreement (Collateralized Personal Loan) Not open to residents of the State of Michigan

Here's what was received.

---

# CPL Agreement (Collateralized Personal Loan) Not open to residents of the State of Michigan

Please complete this form to enter your pledge

Email *

kellsa.tayler@gmail.com

# CPL Agreement

The form CPL Agreement  is no longer accepting responses.
Try contacting the owner of the form if you think this is a mistake.

This content is neither created nor endorsed by Google. Report Abuse - Terms of Service - Privacy Policy

**Google** Forms

 

# New Updates

## REFRESH THIS PAGE TO SEE THE MOST RECENT UPDATE

### Participation is not available to Michigan residents

## WOW!

We've made it this far together and I am so excited for our futures!

I will list / link new updates here in case you miss receiving them in your inbox so you don't miss any pertinent information...

---

**September 8, 2021**: Click Here for new Update

**September 9, 2021**: Click Here for new Update

**September 10, 2021**: Click Here for new Update

**September 13, 2021**: Click Here for new Update

**September 14, 2021**: Click Here for new Update

**September 15, 2021**: Click Here for new Update

**September 16, 2021**: Click Here for new Update

**September 17, 2021**: Click Here for new Update

**September 20, 2021**: Click Here for new Update

**September 21, 2021**: Click Here for new Update

**September 22, 2021**: Click Here for new Update

**September 24, 2021**: Click Here for new Update

**September 27, 2021**: Click Here for new Update

**September 28, 2021**: Click Here for new Update

**September 29, 2021**: Click Here for new Update

**September 30, 2021**: Click Here for new Update

**October 1, 2021**: Click Here for new Update

**October 4, 2021**: Click Here for new Update

**October 5, 2021**: Click Here for new Update

**October 6, 2021**: Click Here for new Update

**October 7, 2021**: Click Here for new Update

**October 8, 2021**: Click Here for new Update

**October 11, 2021**: Click Here for new Update

**October 12, 2021**: Click Here for new Update

**October 13, 2021**: Click Here for new Update

**October 14, 2021**: Click Here for new Update

**October 15, 2021**: Click Here for new Update

**October 18, 2021**: Click Here for new Update

**October 19, 2021**: Click Here for new Update

**October 20, 2021**: Click Here for new Update

**October 21, 2021**: Click Here for new Update

**October 22, 2021**: Click Here for new Update

**October 25, 2021**: Click Here for new Update

**October 26, 2021**: Click Here for new Update

**October 27, 2021**: Click Here for new Update

**October 28, 2021**: Click Here for new Update

**October 29, 2021**: Click Here for new Update

**November 1, 2021**: Click Here for new Update

**November 2, 2021**: Click Here for new Update

# REFRESH THIS PAGE TO SEE TODAY'S UPDATE

Copyright 2021
This information is confidential and for the eyes of partners only. It may not be published, in part or in whole, anywhere, without the express written permission of Michael Glaspie.

2) The term of this injunction is perpetual.

3) This Order binds Michael Glaspie and Banner Co-Op, Inc., their officers. agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise.

4) No security is required as the Plaintiff is an agency of the State of Michigan acting in an official capacity.

5) Michael Glaspie and Banner Co-Op, Inc. are in civil contempt of court and the Court retains personal jurisdiction over them after entry of this Order. The Court awards no fine and no costs.

6) Michael Glaspie and Banner Co-Op, Inc. acknowledge that a violation of this Order may, in addition to civil sanctions and remedies, subject them to a criminal fine of up to $7,500, jail of up to 93 days, or both, as well as probation. See MCL 600.1715.

7) This is a final Order that disposes of the last pending claim and closes this case.

Date: _____                    by: _____
                                HON. SHALINA KUMAR

"We stipulate to the entry of the above consent judgement."

Date: 10-08-2021                by: /s/ Brien Heckman
                                Brien Winfield Heckman P76006
                                Assistant Attorney General
                                Attorney for the Bureau

Date: 10-8-21                   by: _____
                                Michael Glaspie
                                Defendant

Date: 10-8-2021                 by: _____
                                Matthew J. Turchyn
                                Attorney for Defendants



Charles Howard, MD, MMM
Prison Medical Consultant
MedAvise Consultants, LLC
3585 NE 207th St Ste C9  #801235
Miami, FL 33280  Tel: 786-539-3340

MedAviseConsultants.com

June 26, 2023

RE: Michael Glaspie
TO WHOM IT MAY CONCERN:

## SUBJECT MATTER EXPERT BACKGROUND

I, Charles Howard, MD, MMM am retired from the Federal Bureau of Prisons  (BOP) having served-20 years as a Medical Officer. From November 2002 to December 2016 I worked at the Federal Medical Center, Devens, (FMC Devens) in Ayer, Massachusetts, as a staff Physician.  I also served as the National Ophthalmology consultant to the Federal Bureau of Prisons for the past 20 years.  From December 2016 until December 2022 I have been the Medical Director at the Federal Detention Center, Miami (FDC Miami).  I was responsible for examining, evaluating, treating, and coordinating all Medical Care for all inmates in the facility.  There are approximately 20,000-30,000 inmates seen at this institution annually.   I am Board Certified in Quality Assurance and Utilization Review, a Fellow of the American Institute of Health Care Quality Management, and a Senior Analyst and Diplomate of the American Board of Disability Analysts.  In 2005, I earned a Masters Degree in Medical Management (MMM) from HJ Heinz School of Public Policy and Management at Carnegie Mellon University, Pittsburgh, PA.

FMC Devens is an  administrative facility that houses convicted Federal Offenders who require all levels of specialized or long term medical and/or mental health care. It is one of six (6) Federal Medical Centers Nationwide operated by the BOP.  FDC Miami is also an administrative facility that houses Detainees who are Pre-Trial, Pre-Sentenced, and Sentenced inmates. Both facilities also house low and medium security level inmates who do not require specialized medical or mental health care.  Both facilities are fully accredited by several Accrediting Agencies and have passed the American Correctional Association and BOP Program Review Accreditation processes repeatedly.

## SCOPE OF REPORT

I was contacted by Mr. Glaspie as a Subject Matter Expert to assist in providing appropriate, and accurate Medical Information during pre-sentencing to assist The Court's understanding of his very complex and life changing medical issues.  I was further asked to opine on the best possible location for his complex care.

In order to render my Subject Matter Expert opinion, I extensively and comprehensively reviewed all Mr. Glaspie's Medical Records from several of his treating Physicians.

Exhibit B

# MEDICAL SUMMARY

Mr. Glaspie is a 72 year old man who used to be a very High functioning individual. He overcame family and societal issues to become a very successful businessman, motivational speaker, and internet influencer.  As a child he reports being in a Physically and Emotionally abusive Father-Son relationship.  This has resulted in his Post Traumatic Stress Disorder (PTSD) and associated Depression, Anxiety, and Obsessive Compulsive behavior. Despite this difficult early life, according to his web site he has authored several self help books and gave countless self help and motivational lectures.

His health issues started to affect him in 2000 when he underwent his first of many neck surgeries. He has since had at least six Cervical and Lumbar Spine surgeries for herniated discs, and radiculopathy. (Pain going down an arm or leg)  He also Had a Rotator Cuff repair in 2009.  In 2015 he had an Oncocytoma (tumor) removed along with a portion of his Left Kidney and Adrenal Gland.  Due to these moderately severely painful conditions, he became a constant user of Codeine for significant pain management. His records showed that he tried several other medications including Tylenol, Nonsteroidal Anti-Inflammatories (NSAIDS) and even Marijuana.  None of those products gave significant pain relief.   He also became very depressed and anxious. In addition, he was noted to have all the symptoms of secondary Hypogonadism, anxiety, impulsivity, irritability , loss of interest, racing thoughts, and sleep changes.  His Endocrinologist placed him on Testosterone, which resolved most of these symptoms, as long as he continued the every two weeks injections.

Due to his now advanced age, he has developed extraordinarily compromising physical impairment.  About ten years ago (10) he began having balance issues and started using a cane to help support him while walking.  He later became more and more confused, anxious, and became significantly confused cognitively.  He was seen by a Neurologist who, several years ago, diagnosed him with Early onset Alzheimer's Disease.  Mr. Glaspie reported he first noticed cognitive difficulty in 2018.  At that time his Neurologist documented he could not remember how to turn on windshield wipers in his car, and was getting lost driving in formerly familiar areas.

His ambulation and balance issue has become so severe that he no longer can rely on a cane for walking fany distance, now requiring a wheel chair.  Over the last several years his cognitive abilities have decreased further, asking the same question repeatedly, and not remembering 5 objects mentioned to him at a medical exam, just minutes earlier. He is noted by his wife to not remember where he put things, or stores things.

According to multiple Medical Records, his wife has reported he gets severe nightmares, and has, on occasion fallen out of bed onto the floor, suffering minor injuries.  To date he has not suffered any severe injuries.

Mr. Glaspie has also been followed for Major Depression, and Anxiety in the Riverview Community Mental Health Center.  Those notes clearly state that he suffered severe Major Depression, was in Alcohol abuse remission long term (He reports his last alcoholic drink in 1979 at 28 years old).  Mr. Glaspie was Baker Acted once for suicidal ideation.  He has a history of confusion for over two (2) years, anxiety, depression, poor appetite, avoidance, crying spells, guilt impulsivity, irritability, loss of interest, panic attacks, and racing thoughts. He reported Physical and Mental abuse by his father as a child. This seems to be the alcohol drinking catalyst.  He overcame this addiction at the age of 28.  He has been on Zoloft and Mirtazapine for aniety and depression treatment with marginal improvement.

Mr. Glaspie underwent Nerve Conduction studies and an Electromyogram due to documented decreased sensitivity in both upper extremities.  These were consistent with carpal tunnel syndrome likely resulting from bilateral C5-6, and right C6-7-T-1 radiculopathy. (Cervical spine abnormalities causing pain in the arms).

Mr. Glaspie's medication list includes:
    For Anxiety: Clonazepam (started in 2017), Zoloft
    For Depression: Mirtazapine, Zoloft, Sertraline
    For Dementia: Donepezil

For Muscle Spasm: Tizanidine
For Nerve Pain: Gabapentin
For Osteoarthritis (mostly Cervical and lumbar spine): Meloxicam
For Pain: Tylenol with Codeine (since 2006, about 17 years)
For Hypogonadism: (Not muscle building): Testosterone

Over the past year he and his wife report he has become more consistently incontinent of both urine and stool , now unable to control his elimination sphincters. All these issues have made him seriously infirm with increased anxiety, depression, and impulsive.

## TECHNICAL STUDIES CONFIRMING LOSS OF CONGNITION

PET Brain Imaging for Metabolic Evaluation: 5/16/2023:  Mild cortical atrophy and mild hypoperfusion in temporal lobes anteriorly and bilaterally.  This is consistent with Alzheimer's. (Hypoperfusion indicates lack of blood flow to the stated areas of the brain, affecting functions controlled by those areas)

EEG 3/28/2023  Abnormal Diffuse Theta Wave Slowing consistent with global cerebral dysfunction. (Indicating non -functioning areas of the brain and explaining impulsive, uncontrollable behavior)

Neurological Cognitive Testing: May 2023 (Multiple visits) Could not recall five (5) objects told to him after five minutes.  He was able to repeat them immediately after he was told the items. He was NOT able to copy drawing a cube, and was unable to place hands in a correct position on a clock.  These are signs of worsening cognitive abilities.

## FEDERAL BUREAU OF PRISONS OPERATIONS

The Federal Bureau of Prisons does not have facilities that are essentially full nursing care except in very limited circumstances.  The only facilities that may be able to take care of a patient requiring this type of care are limited beds in Long Term Care Units at one of the Medical Centers.  As stated, they are very limited, and typically reserved for terminally ill Cancer patients.  Due to the high volume of elderly Infirm Federal Inmates, these beds only become available when an inmate expires.  There are no programs o deliver reliable, consistent personal care to inmates at Federal facilities.  On occasion, an inmate may assist another with carrying food service trays or dressing, but there is no specific, consistent care provision.  Mr. Glaspie has needed someone present to assist with activities of daily living such as dressing, toileting, feeding, transferring and ambulating, commonly referred to as Activities of Daily Living.  That person is currently his wife.

## PRISON LIFE ENVIRONMENT

Alzheimer's patients frequently succumb to infections .  These increase the rapidity with which they decline.  They are well known to be more prone to infections than the general population.  Inmates live in a densely populated setting where spread of infectious disease has always been a concern, even prior to COVID-19.   These infections are sometimes the result of inmates sharing items such as soap, towels, or clothing, because they are not always readily available.  Much of the responsibility for

controlling infections falls to inmate's diligence about cleansing and disinfecting areas. As might be expected, inmates frequently fall short on cleansing and disinfecting, creating additional problems. An Alzheimers patient is much less likely to be diligent about cleanliness and disinfecting areas. Furthermore, there is no way to keep Mr. Glaspie from falling out of a Prison bed, something he has done several times in the past few months. This, again is part of his Alzheimer's, lack of balance, and dementia state.

The "high touch" areas where contagion of disease is a concern are toilets, showers, telephones (shared by multiple inmates each day) and computer terminals. During my career, I witnessed many infectious disease outbreaks including Methicillin Resistant Staph Aureus (MRSA). For healthy inmates, the risks are not as troubling as for an immunocompromised individual or an Alzheimer's patient, for whom any type of infection could be life-threatening.

A term of incarceration for anyone is challenging; however, for those with Cognitive limitations such as Alzheimer's, incarceration is much more difficult. Because of Mr. Glaspie's lack of ability to self care, and requiring continuous assistance with Activities of Daily Living such as toileting, dressing, transferring, eating, and personal sanitation on a daily basis, imprisonment is harsher. Medical Centers are considered Administrative Facilities. These facilities have inmates of all Security and Criminal history. Administrative facilities are comprised of more inmates at higher security levels, with lengthy criminal records, when compared to a minimum or low-security prison, where most inmates are serving prison sentences for similar low security level crimes with relatively short sentences. Minimum to low security inmates, and especially, those who are unable to self care in this environment are typically more vulnerable to abuse by more "seasoned" and violent inmates because they have no prior criminal activity nor violent backgrounds.

Inmates with dementia, or Alzheimer's are much more vulnerable to abuse from other inmates. Their erratic behavior and inability to follow directions tends to aggravate other inmates, as well as staff already in a tense and violent environment. This is well documented in books such as Tina Maschi co-author of "Aging Behind Prison Walls". Dr. Maschi is a Professor at Fordham University Graduate School of Social Service. She is well published in the fields of Aging, Physical and Mental Health in the Criminal Justice System and it's enormous fiscal cost to the Nation. The Government Fiscal impact for an elderly inmate requiring medical services while incarcerated is frequently greater than $104,000 annually. If one requires recurrent and/or lengthy hospitalizations, which is likely in Mr. Glaspie's condition, this can very quickly and easily become Millions of dollars.

Several studies, including from the Federal Bureau of Prisons itself have documented that typical healthy aging inmates engage in fewer misconduct incidents while incarcerated and have a much lower rate of recidivism. This has been documented at less than 5%. These studies do not consider lack of cognitive ability, the typical inability to care for oneself, and sudden uncontrolled spontaneous movements common in patients such as Mr. Glaspie. Further continued decline in both Physical and mental functioning his lack of ability to function in a prison environment. He would be required to stand, waiting for medications, for movement announcements, should he comprehend them properly. He already demonstrates an inability to follow directions and deliver appropriate self care unaided.

(continued)

## <u>CURRENT STATE AND PROGNOSIS FOR MR. GLASPIE</u>

After a comprehensive exhaustive review of all Medical records available, it is painfully clear that Mr. Glaspie's Medical condition has significantly deteriorated over the past few years. Mr. Glaspie now requires 24 hour/day, 7 day/week assistance with Activities of Daily Living.  It is my understanding that currently, his wife of many years provides him that care.  He is highly likely to deteriorate to the point of completely bed ridden within the next 5 years.  This is predictable based upon his progression to date and likelihood of continued worsening.

I have seen many similar cases, at Federal Medical Center Devens, and at the Federal Detention Center Miami over my Twenty Years (20) BOP experience.  The downward spiral in both an Inmate's physical and mental health is overwhelming.  As his Alzheimer's (cognitive abilities) worsen, the course of deterioration leaves one little hope of finishing their incarceration as a thinking individual or possibly not alive.  This progressive condition Alzheimer's has started, and is is likely to deteriorate more and more rapidly as time progresses.  This is typical of Alzheimer's Disease.

Ultimately the Inmate gives up entirely, due to recurrent hospitalization for very lengthy periods of time, and unable to receive visitors without special permission of the institution's Warden.  This additional life extending Medical Care comes with a cost of millions of dollars of Federal Government fiscal responsibility. Not only are there very expensive Medical Costs, there are also significant custody costs per local hospital trip of over $600.00 for each consultation. Hospitalized custody costs require at least two officers stay with the inmate each of three shifts, twenty-four  hours/day.  As a former Federal Government Employee these expenses are not consistent with good Stewardship of Federal Funds.  The typical cost of care for elderly infirm inmates is over $104,000/year excluding any hospitalizations. Once Hospitalized more than a couple of weeks, they transition into what is known as "Catastrophic" expenses requiring allocating upwards of a million dollars to cover expenses for each admission.

Mr. Glaspie is currently awaiting a date for another Neck surgery that hopefully, will decrease his neck pain.  If he were incarcerated, this would not be accomplished, and he would continue in severe pain, resulting in further incapacitation as his spinal osteoarthritis worsens.  If this surgery and post operative rehabilitation, (Physical Therapy) is not performed prior to incarceration, it would likely be over a year or two before it could be accomplished once incarcerated.  The reason it would take this long is that it requires he first being transferred to a Medical Center, then being re-evaluated by a Neurosurgical Specialist who has never seen him.  Once requested, these appointments take several months to obtain, even in the private sector.  The entire evaluation and conservative care routine that has been done over the past few years would have to be repeated, further lengthening the time to surgery.  This would ultimately be a Delay in Care that would be difficult for the Federal Bureau of Prisons to defend.  It would be very costly, and risk his already limited mobility becoming much worse resulting in he becoming 100% bedridden.  Because of my extensive experience, I have seen this occur several times.

Mr. Glaspie is currently one of only 220 individuals participating in a Pharmaceutical study evaluating a new medication to help stop progression of Alzheimer's disease. The drug is called Remternetug.  This drug will not reverse the damage, but is intended to halt the progression.  If successful, he would not loose what he has left of his cognitive ability and be able to partially function while taking the newly approved medication.  The study protocol involves several MRI's, PET scans, and clinical visits to monitor patient response.  He needs to be seen in the study center to receive the IV infusion on a regular basis over approximately 79 months. This is the duration of the study.  If incarcerated, he will

not have availability of this medication, which will, no doubt cause further and more rapid decline in his physical and cognitive abilities.  His decline has already accelerated in the past ten years. It is likely to continue accelerating if not treated with this most promising new medication.  All indications to date appear to indicate it will be successful.

One of the Hallmarks of Early Alzheimer's disease is poor judgement, even before the commonly known memory loss.  Poor judgement in Alzheimer's is not one poor decision, but rather a pattern of clearly inappropriate decisions or actions.  This is well documented in literature and lay press.  I bring this up, not as an excuse for Mr. Glaspie's case, but as Medical documentation for possibly why he made poor judgemental, financial decisions resulting in his conviction.

Mr. Glaspie's wife now cares for him and is responsible for his Testosterone injections due to Hypogonadism. (Not as a body building medication).  Without these injections, Mr. Glaspie will have compromising increased risk of cardiovascular disease, increased rapidity of bone density loss,  with subsequent increased risk of osteoporotic fractures due to what would, in most non severely osteoporotic and stable ambulating individuals, be only a minor bruise.  These issues were clearly delineated in his Endocrinologist's notes.

The typical life expectancy of an Alzheimer's patient is 4-8 years with a 60-70% FUNCTIONAL life expectancy.  Mr. Glaspie is already at least in his third to fifth year of symptoms.

According to the Alzheimer's foundation, there are three typical stages:

Mild:
Memory loss, poor judgement, loss of spontaneity/sense of initiative, losing track of dates or location.  Longer to complete normal Activities of Daily Living, Repeating questions, forgetting recent learning. Trouble handling money or bills, Challenges planning or solving problems, wandering, getting lost, misplacing things, Difficulty completing tasks like bathing, mood/personality change, increased anxiety/aggression..

Moderate:
Increased confusion, memory loss, of events, personal history, withdrawal from social activity, inability to learn new things, difficulty with language, reading, writing, working with numbers, organizing thoughts, thinking logically, short attention span, coping in new situations. Sleep pattern change. Difficulty with Activites of Daily Living like dressing.  Hallucinations, delusions, paranoia, impulsiveness, undressing inappropriately, vulgarities, inappropriate emotional outbursts, restlessness, agitation, anxiety, tearful, wander especially late at night, repetitive statements/movements, muscle twitches.

Severe:
Cannot communicate, depend on others for all care. In bed most of time.  Can't communicate, no awareness of recent experience or surroundings, weight loss, no interest in eating, seizures, physical decline, dental, skin, foot, difficulty swallowing, groan, moan, grunt, increased sleep, total loss of bowel and bladder control. Death commonly due to aspiration pneumonia.

Mr. Glaspie is currently in the Moderate to early late stage of Alzheimer's Disease.

## <u>CONCLUSIONS</u>

Due to Extraordinary and Compelling reasons, Mr. Glaspie should be allowed to complete two Medically Necessary issues Prior to incarceration:

1. Neck surgery and post operative Physical Therapy. Surgery date appointment pending.
2. Alzheimer's Medication National study.  Study time to complete per Documents: 79 weeks.

Additional Extraordinary and Compelling Reasons to consider in Mr. Glaspie's case are:
1. Difficulty ambulating requiring a wheel chair for distances, in addition to walking with cane.
2. Requires assistance dressing, toileting, personal hygiene, carrying items such as a food tray while attempting to ambulate
3. Falls out of bed onto floor while sleeping
4. Looses way to and from different rooms in his home environment
5. Significant decrease in cognitive ability over past 10 years, not recognized until worsened about 2-3 years ago.
6. Degree of acceleration to Severe stage of Alzheimer's likely to occur in next 12-24 months if left untreated with Remternetug
7. Total bed care also likely if untreated.

Please consider the severity of the Medical Conditions Mentioned, the likelihood that he will become fully non functional in the next 2-4 years, as Compelling and Extenuating Circumstances severe enough to allow Mr. Glaspie to serve his incarceration in a Supervised Release or Home Confinement.

Thank you for your consideration.

*Charles Howard, MD*

Charles Howard, MD, MMM
Former Medical Director, Miami Federal Detention Center
Prison Medical Consultant
Master of Medical Management
Fellow American Board of Quality Assurance  & Utilization Review Physicians
Fellow American Institute of Health Care Quality Management
https://MedAviseConsultants.com
https://Charleshowardmd.com
drhoward@medaviseconsultants.com
MedAvise Consultants,  LLC
3585 NE 207th St Ste C9  #801235
Miami, FL 33280
Tel: 786-539-3340